# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| ROBIN L. MANNOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 4:15-cv-01413-SGC |
| ) | |
| CHRISTOPHER J. PEARCE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION[1]

The court has before it the January 13, 2017 motion for summary judgment filed by Defendant Christopher J. Pearce. (Doc. 14). Pursuant to the court's initial order, the motion is fully briefed and under submission as of February 16, 2017. (Docs. 10, 15-19). After consideration of the briefs and evidence, the motion is due to be granted for the following reasons.

## I. STATEMENT OF FACTS

On the night of August 19, 2013, Plaintiff Robin L. Mannor and her husband were at home near Scottsboro, Alabama, in Marshall County. (Doc. 16-3 at 7). Plaintiff had two or three bourbon and cokes and then got into an argument with her husband over finances. (*Id*. at 7, 14). During the argument, Plaintiff's husband told Plaintiff he was moving out and began packing his belongings. (Doc. 16-4 at

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 9).

4). At some point, Plaintiff bit her husband and struck him repeatedly with a picture frame, breaking the glass. (Doc. 16-3 at 8-9; Doc. 16-4 at 4-5). When he realized the glass was broken, Plaintiff's husband thought the situation was becoming dangerous and called 911. (Doc. 16-4 at 5). While he was on the phone with 911, Plaintiff retreated to the bathroom and called a friend. (Doc. 16-3 at 10). Plaintiff remained in the bathroom for approximately forty-five minutes and assumed her husband left the house. (*Id*).

The 911 dispatch notified Defendant, Marshall County Deputy Christopher Pearce, of the domestic fight call, and he arrived at Plaintiff's house at approximately 12:30 a.m. (Doc. 16-1 at 10). Grant Police Officer Thomas Sorrell arrived shortly thereafter as a backup unit.[2] (*Id*.). Plaintiff's husband was waiting outside when the officers arrived. (Doc. 16-4 at 5). His belongings were packed inside his truck, and he was ready to leave. (*Id*.). Plaintiff's husband told Pearce and Sorrell everything was okay, Plaintiff was inside the house, and he was leaving. (*Id*. at 6; Doc. 16-1 at 10-11). Pearce observed a bite mark and scratches on Plaintiff's husband. (Doc. 16-1 at 11).

While Pearce was talking to Plaintiff's husband, Sorrell entered the home to locate Plaintiff and found her in a locked bathroom. (*Id*. at 10; Doc. 16-2 at 5).

---

[2] Defendant requested backup from the Grant Police Department because there was not another Marshall County deputy available as the department was short-handed that night. (Doc. 16-1 at 10). It is routine for two law enforcement officers to respond to a domestic violence call where physical force is used. (Doc. 16-2 at 11). In general, domestic violence calls are particularly dangerous for law enforcement officers. (*Id*.).

Plaintiff would not unlock the door and come out of the bathroom. (*Id.*). Sorrell went back outside and informed Pearce, and both Sorrell and Pearce entered the house to talk to Plaintiff. (Doc. 16-1 at 11). The officers knocked on the bathroom door and "gave her loud, verbal commands" to come out of the bathroom so they could speak with her. (*Id.* at 12). Plaintiff told the officers she was not coming out of the bathroom. (*Id.*). The officers explained they were there to investigate a domestic violence report and by law they had to talk to her. (*Id.*). After approximately five to seven minutes, Plaintiff came out of the bathroom. (*Id.*).

When Plaintiff exited the bathroom, Pearce and Sorrell observed the "strong smell of alcohol, slurred speech, [and] bloodshot eyes" and believed Plaintiff was "very inebriated."[3] (*Id.*; Doc. 16-2 at 5). She refused to hang up on her phone call. (Doc. 16-3 at 10). After hearing her version of events, Pearce told Plaintiff she was under arrest for domestic violence and instructed her to turn around with her hands behind her back. (Doc. 16-1 at 12; Doc. 16-2 at 5). Plaintiff testified she told Pearce she did not want to hang up her telephone but eventually put it down and complied with Pearce's instructions. (Doc. 16-3 at 11). According to Pearce and Sorrell, Plaintiff did not comply, Pearce had to physically turn her around,[4] and Perace needed Sorrell's assistance to place her in handcuffs. (Doc. 16-1 at 12-13;

---

[3] Plaintiff testified she was not intoxicated. (Doc. 16-3 at 15).
[4] Sorrell testified she turned around on her own accord. (Doc. 16-2 at 5).

Doc. 16-2 at 5). Plaintiff was not aggressive toward the officers. (Doc. 16-1 at 13).

The officers then escorted Plaintiff out of the house in handcuffs. (*Id*.; Doc. 16-4 at 6-7). As they led her out of the house, Plaintiff saw her husband and began to yell and curse at him. (Doc. 16-3 at 12; Doc. 16-1 at 13). Pearce placed Plaintiff in his patrol car and began to write a report about the incident. (Doc. 16-1 at 13). Plaintiff's husband told Pearce he did not want Plaintiff arrested and refused to sign the report. (Doc. 16-1 at 13; Doc. 16-4 at 7). Plaintiff continued to yell while in the police car and shouted for someone to call DHR to take care of her minor son.[5] (Doc. 16-2 at 5; Doc. 16-4 at 8). Pearce testified Plaintiff banged against the glass, and he was scared she would kick the window out.[6] (Doc. 16-1 at 13).

Pearce opened the car door, and Plaintiff exited the car without assistance. (Doc. 16-3 at 13). Pearce instructed her to sit on the ground and cross her legs, and Plaintiff complied. (*Id*.; Doc. 16-2 at 5; Doc. 16-4 at 8). She remained handcuffed. (Doc. 16-3 at 14). Sorrell contacted DHR, explained the situation, and held the phone to Plaintiff's ear so she could speak with DHR. (*Id*. at 13; Doc.

---

[5] Plaintiff's husband was the child's stepfather. (Doc. 16-3 at 13).
[6] Sorrell and Plaintiff's husband did not witness this behavior. (Doc. 16-4 at 7, 13; Doc. 16-2 at 5).

4

16-4 at 8; Doc. 16-2 at 5). DHR decided to allow Plaintiff's son to remain with Plaintiff's husband. (Doc. 16-4 at 8).

Pearce then instructed Plaintiff to stand. (Doc. 16-1 at 17; Doc. 16-3 at 16). Plaintiff replied she could not stand because of her position on the ground[7] and because she was handcuffed. (*Id.*). Pearce told Plaintiff how to stand from that position, but Plaintiff again stated she could not and refused to stand. (Doc. 16-1 at 14). Pearce then attempted to pick her up, but she "tensed up" and pulled herself down as he tried to pull her to a standing position.[8] (*Id.*; Doc. 16-2 at 6). Plaintiff scratched Pearce on his arms as he attempted to lift her. (Doc. 16-1 at 14-15; Doc. 16-9 at 2; Doc. 16-10 at 2). Pearce released Plaintiff because he believed he could injure her if he continued.[9] (Doc. 16-1 at 18). Pearce decided the only way to prevent an injury to Plaintiff was to force her to stand on her own will. (*Id.*).

Pearce then used "pressure point control tactics" to force Plaintiff to stand. (Doc. 16-1 at 15). Plaintiff's husband urged Plaintiff to stand, stating Pearce would use pepper spray on her. (Doc. 16-3 at 16). Plaintiff replied it would probably be worse and he would probably use a baton. (*Id.*). In response, Pearce stated, "No, taser," and briefly tased her on the back of her neck without any

---

[7] Plaintiff testified the ground where she was seated was wet and muddy and she was wearing high heels. (Doc. 16-3 at 16).
[8] Pearce described Plaintiff's actions as "passively resist[ing]" his instructions. (Doc. 16-1 at 14).
[9] Plaintiff is 5'11" tall and weighed 170 pounds the night of the incident. (Doc. 16-6 at 2). Pearce is 6 feet tall and weighed 260 pounds. (Doc. 16-1 at 15).

warning.[10] (*Id*. at 16, 23; Doc. 16-4 at 10). It is undisputed the taser was in drive stun mode. Drive stun mode creates pain at the point of contact, does not immobilize a person, and is used as a "pain compliance" technique. (Doc. 16-1 at 16).

Plaintiff testified she fell over as a result of being tased the first time[11] and Pearce helped her back into a seated position. (Doc. 16-3 at 16). She did not stand, and Pearce continued to instruct Plaintiff to stand. (Doc. 16-1 at 16; Doc. 16-4 at 10). Pearce tased her again on her neck for the full five seconds allowed by the device and repeated his instruction to stand. (Doc. 16-1 at 16; Doc. 16-2 at 7; Doc. 16-3 at 16). Pearce testified Plaintiff continued to fight against him, scratched him,[12] and did not stand. (Doc. 16-1 at 16-17; Doc. 16-2 at 7). Pearce tased Plaintiff for a third time for the full five seconds. (*Id*.). Plaintiff testified Pearce tased her in quick succession, causing her to jump away from the pain, yell, and urinate on herself. (Doc. 16-3 at 16). After the third time, Plaintiff stood without assistance. (Doc. 16-1 at 17; Doc. 16-2 at 7). Pearce and Sorrell placed her inside Pearce's patrol car, and there were no further issues. (Doc. 16-1 at 17).

---

[10] Pearce and Sorrell testified Pearce showed the taser to Plaintiff and warned her he would use it if she did not stand. (Doc. 16-1 at 16; Doc. 16-2 at 7).

[11] Plaintiff's husband testified Plaintiff stated, "Oh, that didn't hurt," after she was briefly tased the first time. (Doc. 16-4 at 10).

[12] Plaintiff does not deny scratching Pearce and recalls Pearce telling her she scratched him but testified she was not aware she scratched him. (Doc. 16-3 at 22).

6

Plaintiff was charged with domestic violence in the third degree, resisting arrest, assault in the second degree, and disorderly conduct. (Doc. 16-8 at 2-3). The Marshall County grand jury returned a no bill, and her case was closed. (Doc. 18-2).

As a result of the tasing, Plaintiff had burn marks on the back of her neck. (Doc. 16-3 at 23). The marks remained on her neck for a few weeks but did not leave a scar. (*Id.*). Plaintiff testified she suffered psychological trauma from the incident. (*Id.* at 19). She stated she did not leave the house for the next couple of months because she was scared she would encounter Pearce. (*Id.*). She booked appointments to be seen by a mental care physician, but she continually rescheduled them because she was scared to leave her house. (*Id.*).

Plaintiff was seen by a mental care provider on September 9, 2013, less than a month after the incident. (*Id.*; Doc.16-11 at 2). The records do not reflect any psychological trauma and detail the "presenting problem" as: (1) the need for a new psychiatrist;[13] and (2) a worsening of her depression because of her recent move, lack of employment, and lack of child support and because she did "not feel independent with several life situations." (Doc. 16-11 at 2). Under a heading entitled "LEGAL," Plaintiff described the incident with Pearce and Sorrell as follows:

---

[13] Plaintiff stated she saw a psychiatrist in Montgomery for the previous two years for depression and ADD but she had moved to Guntersville and did not have a psychiatrist. (Doc. 16-11 at 3).

7

> [S]he brought ETOH into the home about 4-6 weeks ago; she states that she was intoxicated at the time and bit her husband during a verbal altercation; currently has domestic violence 3rd degree charge, police were called and involved during this time; additional charges "because [she] was running [her] mouth" should be dropped. . . . [S]he is presently seeking anger management classes; court date is scheduled for Nov[.] 2013.

(*Id*. at 6). There are no other medical documents in the record reflecting any treatment sought by Plaintiff as a result of the incident.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## III. DISCUSSION

Plaintiff's amended complaint alleges two violations of the Fourth Amendment, brought pursuant to 42 U.S.C. § 1983: illegal seizure and excessive force. (Doc. 3 at 3-4). In his motion for summary judgment, Pearce asserts both claims are due to be dismissed as a matter of law. (Doc. 14). Plaintiff concedes Defendant is entitled to summary judgment on her claim of illegal seizure. (Doc. 17 at 2).

As to Plaintiff's excessive force claim, Defendant contends he is entitled to qualified immunity. (Doc. 15 at 10-25). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d

1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 248 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate qualified immunity claims.[14] To survive a motion for summary judgment, Plaintiff must satisfy the two-pronged qualified immunity standard: (1) the facts alleged constitute a violation of her constitutional rights, and (2) the constitutional rights were "clearly established" when the defendant committed the act complained of. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The inquiry can begin with either prong, and neither is antecedent to the other. *Id.* at 236.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [police officer] that his conduct was unlawful in the situation he confronted." *Loftus v. Clark–Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal quotation marks omitted). As to whether the conduct alleged is unlawful, courts look to a number of factors to

---

[14] Before applying the two-part test, the initial inquiry is whether the public official proves "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (internal quotation marks omitted). The parties do not contest Pearce was acting within the scope of his discretionary authority as a law enforcement officer at the time of Plaintiff's arrest.

determine whether the use of force in a particular instance was excessive. These include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Draper v. Reed*, 369 F.3d 1270, 1277 (11th Cir. 2004). Other factors include "the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest." *Graham v. Connor*, 490 U.S. 386 396 (1989); *see also Hoyt v. Cooks*, 672 F.3d 972, 978-79 (11th Cir. 2012).

While Plaintiff does not have to demonstrate there is case law specifically addressing her factual scenario, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Plaintiff can demonstrate the contours of the right were clearly established in a number of ways. First, Plaintiff may show "a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow*, 457 U.S. at 818). Second, Plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id*. (citing *Hope v. Pelzer*, 536 U.S. 730, 74 (2002)). Finally, the conduct involved in the case may "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." *Id*. (citing *Lee*, 284 F.3d at 1199).

Plaintiff contends the use of the taser in drive stun mode was a violation of her constitutional rights and Pearce is not entitled to qualified immunity because

11

the law was clearly established that the use of the taser as a means of pain compliance under these facts is excessive force. (Doc. 17 at 10-15). In support of this argument, Plaintiff cites *Wate v. Kubler*, 839 F.3d 1012 (11th Cir. 2016). (*Id.*). The court disagrees with Plaintiff for the following reasons.

First, the court notes the only case cited by Plaintiff in support of her argument was decided in 2016, three years after the incident. *Wate*, 839 F.3d at 1012. Plaintiff must carry her burden by looking to the law as interpreted at the time of the alleged violation. *Mercado*, 407 F.3d at 1159 (citing *Willingham v. Loughnan*, 321 F.3d 1299, 1304 (11th Cir. 2003)). As such, whether or not *Wate* is "materially similar" is irrelevant to the analysis of Plaintiff's claim. *Id.*

There are several relevant, reported Eleventh Circuit cases considering whether the use of a taser or other nonlethal force[15] is constitutionally excessive. The Eleventh Circuit has found similar force to be excessive where the suspect is nonviolent and has not resisted arrest. For example, in *Fils v. City of Atlanta,* the Eleventh Circuit found clearly established excessive force when the officer used a taser twice in probe mode and once in drive stun mode in response to a bystander's comment, "[T]hey're overreacting, these motherf*ckers are overreacting." 647 F.3d at 1277. Similarly, in *Vinyard v. Wilson*, the Eleventh Circuit concluded the

---

[15] The Eleventh Circuit has analogized taser use to other nonlethal force, such as the use of pepper sprays and similar chemical weapons. *Fils v. City of Atlanta*, 647 F.3d 1272, 1289 (11th Cir. 2011).

use of pepper spray on a handcuffed and secured suspect while she was in the back of a police car was excessive. 311 F.3d at 1355. Finally, in *Priester v. City of Riviera Beach, Fla.,* the Eleventh Circuit concluded the use of an attack dog on the plaintiff was excessive where the plaintiff had submitted to the officer's commands and was lying flat on the ground. 208 F.3d 919, 927 (2000).

That being said, police are permitted to use tasers to secure a suspect they reasonably perceive as threatening. In *Zivojinovich v. Barner*, the Eleventh Circuit concluded the use of a taser in probe mode against a suspect who violently resisted arrest and appeared to spit blood at an officer was not excessive force. 525 F.3d 1059, 1073 (11th Cir. 2008). Additionally, the Eleventh Circuit found the use of a taser in probe mode was reasonable against a suspect who was "hostile, belligerent, and uncooperative" but not close enough to the officer to pose an immediate threat. *Draper*, 369 F.3d at 1278. The initial offenses in these cases were quite minor: trespass in *Zivojinovich* and a broken tag light in *Draper*. 525 F.3d at 1063; 369 F.3d at 1272. However, the potential threat posed by the suspect sufficiently altered the constitutional calculus and allowed for a greater use of force. *Id.* at 1073.

Analyzing Plaintiff's case in light of these precedents, the court cannot conclude Pearce's use of the taser in drive stun mode under these circumstances was clearly established as excessive force. With regard to the need for force,

13

Plaintiff was, at the very least, passively resisting Pearce for a moderately serious crime. Although domestic abuse crimes can be extremely serious for the officers called to the scene, the situation here had diffused by the time officers arrived at Plaintiff's house. Plaintiff was not a threat to the officers, and although she refused to follow instructions and was emotional, there is no evidence she made any threatening or dangerous movements toward the officers. It is undisputed Pearce used his taser as a means to inflict pain to force Plaintiff to comply with his instructions.

The final question the court must answer to determine the need for use of force is whether Plaintiff was "actively resisting arrest." *Graham*, 490 U.S. at 396. It is undisputed Plaintiff refused to follow Pearce's instructions. However, there is a factual dispute as to whether she was actively or passively resisting. Plaintiff describes herself as unable to stand from her position on the muddy ground in high heels. (Doc. 16-3 at 16). Pearce, on the other hand, testified Plaintiff continued to yell, curse, and scratch him in an attempt to resist his ability to force her to stand. (Doc. 16-1 at 16). Making all reasonable inferences in Plaintiff's favor, the court cannot conclude Plaintiff was actively resisting arrest or actively resisting Pearce's instructions. The court, however, cannot find any applicable case law regarding how a reasonable officer in Pearce's position should respond when a suspect is passively resisting arrest. The court notes at least one police department within the

Eleventh Circuit encourages the use of a taser as a response to passive resistance. *See Chaney v. City of Orlando, Fla.*, 291 F. App'x. 238, 244 (11th Cir. 2008).

Additionally, regarding the extent of the injury inflicted, the court cannot find any relevant, reported case law considering the use of a taser in drive stun mode. All of the cases involve probe mode, a significantly more intrusive and painful experience. Drive stun mode causes pain, but it generally leaves little lasting damage beyond a burn mark. In this way, it is a less serious use of force than the use of a taser in the Eleventh Circuit cases discussed above.

In summary, Plaintiff cannot point to "case law with indistinguishable facts clearly establishing the constitutional right [or] a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009). Therefore, Pearce is entitled to qualified immunity unless his conduct was "so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution." *Willingham*, 321 F.3d at 1303. The court simply cannot find the use of the taser in drive stun mode under the circumstances presented here was so far past that border. As such, Pearce is entitled to qualified immunity, and his motion for summary judgment is due to be granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant Pearce is entitled to judgment as a matter of law on all the claims asserted by Plaintiff's Amended Complaint. Defendant's motion for summary judgment is due to be granted. (Doc. 14). A separate order will be entered.

**DONE** this 23rd day of March, 2018.

*/s/ Staci G. Cornelius*
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE